**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------
K.F. and J.F. on behalf of their son, T.F.,

                Plaintiffs-Appellants,              2:18-cv-1838

                v.                         <u>COMPLAINT</u>

Riverhead Central School District,

                Defendant-Appellee.
----------------------------------------------------


      Plaintiffs, K.F. and J.F., individually on behalf of their son, T.F., by their attorneys, the Law Offices of Tela L. Troge, PLLC, as and for their Complaint, allege and state the following:

**PRELIMINARY STATEMENT**

1.      Plaintiffs are the parents of a disabled child and bring this action pursuant to the Individuals with Disabilities Education Act ("IDEA") (20 U.S.C. § 1400-1482) and Article 89 of the New York State Education Law against the Defendant Riverhead Central School District.

2.      Plaintiffs additionally bring claims under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794[a]), the Americans with Disabilities Act (ADA), and Section 1983 of the Civil Rights Act of 1964 (42 U.S.C. § 1983).

3.      Plaintiffs have pursued this matter through the impartial hearing process and the New York State Education Department (NYSED) Office of State Review (OSR) to exhaust administrative remedies.

4.      Plaintiffs seek review and partial reversal of the decision of the State Review Officer ("SRO") dated November 27, 2017.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction under the IDEA, 20 U.S.C. § 1415(i)(2)(A) and (3)(A) and 28 U.S.C. §§ 1331 and 1348.  This Court is authorized to grant the requested declaratory relief pursuant to 28 U.S.C § 2201-02, and to award Plaintiffs reasonable attorney's fees pursuant to the IDEA, 20 U.S.C. § 1415(i)(3)(B).

6.      The venue for this action lies in the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391.  The Eastern District of New York is the judicial district in which both the Defendant and Plaintiffs are situated and in which the claim arose.

## PARTIES

7.      Plaintiffs T.F. his parents K.F. and T.F. are not expressly named herein due to the privacy protections guaranteed by the IDEA, and the Family Educational Rights Privacy Act pursuant to 20 U.S.C. § 1232 (g) and 34 C.F.R. § 99.

8.      Plaintiffs K.F. and J.F. ("Parents" hereafter) are the parents of T.F. K.F. is the father of T.F. and J.F. is the mother of T.F.  Both parents and child currently reside with T.F. on the Shinnecock Indian Reservation in Southampton, New York.  During the relevant time of this action, both parents and child resided in Flanders, New York within the district to attend public school at the Riverhead Central School District.

9.      Defendant Riverhead Central School District ("District" or "RCSD" hereafter) is the local education agency responsible for the provision of appropriate special education and related services to children classified under the IDEA as disabled who reside in in its district.

## FACTUAL ALLEGATIONS

### Background

10.     T.F. is a nine year-old Native American boy diagnosed with autism spectrum disorder, Tourette's disorder, attention deficit hyperactivity disorder (ADHD) combined type, anxiety

disorder, developmental coordination disorder, developmental disorder of speech and language, and sensory integration dysfunction. See Exs. at D41; D46; D1-3; D1-49, Tr. at 1292; SRO Decision, at 3.

11.     In September of 2011 Parents first approached the District for special education assistance and consented to evaluations at Just Kids Early Childhood Learning Center. Dist. Ex. D1-3, D1-49; T. 1292. The Just Kids evaluations were not administered until July 2012 which was not in compliance with the required 60-day completion time period. Tr. at 1153; Dist. Ex. D21, 22, 23. The CPSE met for an "initial eligibility determination" on August 6, 2012, and recommended individual speech/language therapy twice weekly for 30 minutes. Dist. Ex. D3-1. Director Chappell was not present nor was any other special education administrator or regular education teacher. Id. The individualized education plan (IEP) was implemented on September 5, 2012, when T.F. was 4-years-old, with placement at Just Kids. Id.

12.     On March 13, 2013, Parents spoke with the CPSE team about T.F.'s social-emotional and anxiety issues as he "does not want to attend school." Dist. Ex. D4-1. The March 13, 2013 IEP reduced T.F.'s services from individual to small group (5:1) speech/language therapy. Id. T.F.'s strengths and development remain the same as the 8/6/12 IEP. All of the goals remained exactly the same as the A8/6/12 IEP. Dist. Ex. D3-5, D4-4, D4-5. A "Requested Review CPSE to CSE Transition" was held on September 24, 2013 after T.F. began Kindergarten. Ex. D5-1. The IEP indicates that "he is reporting that students are teasing him about his speech" and that "[he] continues to demonstrate errors which impact his overall intelligibility... it impacts him academically and socially." Dist. Ex. D5-2, 5. In early December 2013, T.F. made deep and jagged cuts through his clothing while in art class using adult scissors. Pl. Ex. P; Tr. at 905, 1770, 1892.

13.     At the annual review CSE meeting for the March 21, 2014 IEP, Parents requested an OT

evaluation for T.F. with the sensory issues they observed with tactile and glue. Tr. at 918, 1368.

Functional behavior analysis remarks indicated that "[s]ocially, he was reluctant to come to

school." Dist. Ex. D6-1. The page for "MEASURABLE ANNUAL GOALS" is left blank and

remains blank or not updated until August 14, 2015 IEP. Dist. Exs. D6-7, D7-7, D8-7, D9-7.

14.     The CSE recommended that T.F. have an OT evaluation in the May 19, 2014 IEP. Ex.

D7-1. The CSE then met to develop an IEP on June 18, 2014 for a "follow-up to Annual

Review". Dist. Ex. D8-1. Parents reported that Dr. Silverman diagnosed T.F. with Autism

Spectrum Disorder, Tourette's Disorder, and Anxiety Disorder on 6/16/14. Id.; Dist. Ex. D41. On

August 14, 2014 the CSE team recognized that: "The classroom teacher indicates that [T.F.] has

difficulty separating from his parents… He gets upset with changes in the environment..." Dist.

Exs. D9-1, 9-2. The IEP recommended that T.F. be placed in a Special Class: 15:1:1 five times

weekly for 5 hours and 30 minutes. Dist. Ex. D9-1. There is an increase of Speech/Language

Therapy to 4 times weekly that reduced time for 20 minutes each. Dist. Ex. D9-1. In this August

14, 2014 IEP it was recognized that T.F. needed strategies for positive behavioral interventions,

supports and other strategies. Dist. Ex. D9-7. T.F. "passed three of the five Fundation

assessments for the kindergarten school year." Tr. at 448.

15.     After starting First Grade T.F. was hospitalized on October 6, 2014, due to his concerns

related to his Tourette's disorder "to rule out a seizure disorder and to observe the increase in tic

symptoms." Pl. Ex. M; Dist. Ex. D10-1. During T.F.'s hospitalization and medical observations,

Dr. Parampreet's 10/8/14 evaluations found that "over the past 2 days his whole body [was]

flinching, he is having difficulty walking...." Pl. Ex. M-6. On October 14, 2014 Parents requested

a CSE meeting and Dr. Smith, reviewed the plan "developed for morning transition". Dist. Exs.

D10-2, D37-1-4. On October 21, 2014, Dr. Silverman wrote a letter requesting that the school fill out the Vineland and that a formal BIP be "implemented immediately incorporating desensitization". Dist. Ex. D43-1.

16.     At the October 27, 2014 CSE meeting, Parents reported that T.F.'s "anxiety disorder manifests itself into serious avoidant behaviors, which include aggression, vomiting, crying and attempting to remove his clothing." Dist. Ex. D11-1. Parents expressed that "the current behavioral strategies that are designed to help [T.F.] are not appropriate." Dist. Ex. D11-2. At this point, only the FBA was being completed "in anticipation of a formalized BIP." Dist. Ex. D11-1. On October 30, 2014, October 10, 2014, January 21, 2015 and April 5, 2015 T.F.'s doctors wrote letters stating that T.F. requires home instruction. Dist. Exs. D44-1, N, D17-2. On 11/10/14, Parents filed a New York State Complaint. Pl. Ex. RR.

17.     In November 2014 home instruction began "but sustained participation in home instruction has not happened" due to scheduling and when the providers cancelled and Parents were concerned with the quality of providers' home instruction and T.F.'s progress. Exs. D-74-1, NN, D59-2, D59-9, GG, D59-21, 23, X, D69; T. 1508. The Parents cooperated with providers and signed for providers at each session where Progress Notes were written for Islip Tutoring Services. Dist. Ex. D60-1-4. On November 12, 2014 the Parents did attempt to cooperate with parent training for a meeting with Dr. Smith on November 13, 2014. Pl. Ex. PP. On November 21, 2014, the parent advocate emailed Director Chappell again for T.F.'s records and files. Pl. Exs. MM, PP.

18.     The CSE met on December 2, 2014 but no changes were made on the IEP. Dist. Ex. D12-2. Initial testing of T.F. for a Neuropsychological Evaluation was administered by Dr. Thomas Preston on December 14, 2014. D29-1. On February 3, 2015, Parents emailed Director Chappell

with concerns about not hearing from an agency to provide OT. Pl. Ex. NN-3. Dr. Silverman recommended that T.F. have "Out of district placement" by letter dated March 12, 2015. Pl. Ex. G. On April 13, 2015, the parent advocate wrote to Director Chappell stating that Parents did not agree to home instruction at Phillips Ave portable and that T.F. has remained without instruction since February. Dist. Ex. D72-5. On June 25, 2015, the CSE met and it was recommended that the District "pursue out of district placements that can offer small class size as well as the necessary social/emotional supports." Dist. Ex. D17-2.

19.     T.F. has consistently scored in the "average" range of intelligence on IQ tests and scored "above average" in general knowledge compared to other students his age. T.F.'s First Grade Teacher, Mrs. Fuhs (n/k/a Johnston) testified that "[a]cademically, he was very capable." Tr. at 1067. T.F. is capable of making progress in an educational setting, yet he made no significant progress while he was a student at RCSD. His reading level scores show that he suffered from substantial regression while he was a student enrolled in the District. After First Grade, T.F.'s teacher testified that "he struggled with reading. He didn't have letter sound identification." Tr. at 1067.

20.     Due to severe difficulties T.F. experienced as a direct result of inappropriate placement outside of the least restrictive environment at RCSD, T.F.'s doctors recommended that he be placed on Homebound Instruction after his second month of First Grade. The Homebound Instruction was only meant to be continued until the time that RCSD could find an appropriate educational placement for T.F. As appropriate educational placement was never located by the District, T.F. stayed on Homebound Instruction until the end of the school year in June 2015. No placement was made for T.F. at all for the following 2015-2016 school year beyond "out-of-district placement." Dist. Ex. D17-2.

21.     T.F. was denied an appropriate educational environment in which he could learn and grow. RCSD has failed to provide a free and appropriate public education ("FAPE") since at least September of 2011 by failing to obtain timely evaluations, failing to provide appropriate Individual Education Plans (IEPs), failing to provide an appropriate placement for T.F., and neglecting to provide T.F.'s Parents with information necessary to effectively participate in the IEP process. As a result, T.F. made no meaningful progress at RCSD, suffered significant regression in his scholastic abilities, and continues to function well below his capabilities in all areas of his life.

### RCSD's Failure Pursuant to Child Find

22.     The District failed in its responsibilities under child find where they did not find T.F. to have any disabilities even after his Parents approached them for help. Tr. pp. 918, 1368, 1292, 1469-70; Dist. Ex. D1-3. The District failed in its responsibility to evaluate T.F. for reading disorders, autism, ADHD, Tourette's disorder, sensory impairments, dyslexia, motor function weaknesses, and other needs requiring occupational therapy (OT). Red flags for suspected dyslexia and other disabilities are apparent throughout T.F.'s IEPs. Dist. Exs. D6-5, D8-5, D9-6, D10-6, D12-16, D17-6, Tr. p. 1067.

### RCSD's Failure to Provide Timely Evaluations Harmed T.F.

23.     RCSD failed in their initial obligation to T.F. to timely have the CPSE team meet after his parents initially consented to evaluations for him. In September of 2011 T.F.'s parents first approached RCSD for assistance and consented to evaluations of T.F. Dist. Ex. D1-3; Tr. at 1292. As T.F. turned 3 years old on May 27, 2011, it was appropriate for his parents to get a referral for T.F. in September of 2011, as children begin receiving preschool education services when they are 3 years old.  Despite the parental referral and consent to evaluations, the CPSE did

not meet for an "initial eligibility determination" until 11 months after receipt of the consent, on August 6, 2012. Dist. Ex. D3-1. This is where the problems regarding T.F.'s education first arose. According to expert witness Dr. Harmon Cohen, "that's way beyond the 60-day period of time that's permitted to do an evaluation after referral has been made." Tr. at 1153. Dr. Cohen further testified that, "there are time issues in terms of when certain things were required to be done, and they were not done within the required time limits within Part 200 of the regulations." Tr. at 1151-52.

24.     When asked why several months passed for the evaluations to take place for T.F.'s preschool services, T.F.'s mother J.F. stated that "[t]hey just kept putting it off. You know, we just kept asking and they kept putting it off." Tr. at 1292. There was no consent by T.F.'s Parents or mutual agreement for the school to go beyond the 60 day statutorily mandated time period. The District's untimeliness is a direct violation of 8 NYCRR 200.4(b)(7), as RCSD failed in their obligation to have the CPSE team meet after T.F.'s parents consented to evaluations. RCSD's long delay in having the CPSE meet and administering T.F.'s evaluation also set him back age-wise with his class. T.F. started preschool at 4 years old instead of 3 years old which negatively impacted his development and harmed from the beginning of his first interactions with RCSD.

**RCSD's Failure to Provide Adequate Evaluations Harmed T.F**

25.     RCSD failed to provide adequate evaluations by neglecting to give T.F.'s Parents a list of evaluators to appropriately determine the kinds of special education and related services that T.F. needed. Here, RCSD gave T.F.'s Parents the sole option of "Just Kids" to provide evaluations. No other options were ever provided. Tr. 1292-93; Dist. Ex. D3-13. The Just Kids Structured Observation dated July 10, 2012 is barely a paragraph long and does not state how long that T.F. was observed for in either minutes or hours. Dist. Ex. D21-1. Had RCSD given T.F.'s Parents a

list to choose other evaluators besides those from Just Kids, T.F.'s Parents could have gotten more information on how long T.F. would be observed for in order to gain more insight into his educational and developmental needs. The July 2012 Just Kids psychological and Just Kids speech and language evaluation showed several indications of T.F.'s difficulties and lower intelligibility, yet those evaluations were inconsistent in whether T.F. was eligible for special education and only provided him with services related to speech. Dist. Exs. D22-4, D23-6. T.F. was harmed without evaluations showing consistent findings for needs that included special education services beyond speech. Thus, RCSD's failure to provide a list of preschool programs contributed to inadequate evaluations negatively impacted T.F.'s progress.

26.     RCSD has an obligation to timely and adequately evaluate T.F. in all areas of suspected disability. RCSD failed to fully evaluate T.F. in all areas of his suspected disabilities including autism spectrum disorder, Tourette's, anxiety disorder, sensory impairments, reading disabilities, dyslexia, and motor function weaknesses.  Red flags for suspected dyslexia are apparent throughout T.F.'s IEPs stating T.F. "has difficulty with letter names/sounds, decoding words, and comprehending what he reads…. [and that] [h]e has great difficulty creating a simple sentence." Dist. Exs. D6-5, D8-5, D9-6, D10-6, D12-16.  It was also found that T.F.'s "decoding abilities are weak [and that he] needs support to identify key details in the text". Dist. Ex. D17-6, see also Tr. at 1067. T.F. was harmed by the District's failure to timely and adequately evaluate him since his IEPs were not based on appropriate data and he did not receive the services necessary for him to make progress in his education setting.

**CPSE Team Not Properly Comprised**

27.     The CPSE team was not properly comprised for the August 6, 2012 meeting and March 13, 2013 meeting. There was no special education administrator at the August 6 meeting nor was

there a regular education teacher. Elizabeth Chappell, Director of Pupil Personnel, was required to comprise the CPSE but did not attend according to the sign in sheet. Dist. Ex. D3-9. Instead, the sign in sheet shows Kevin Stack, the former Assistant Director of Pupil Personnel was at the meeting. Id. However, T.F.'s mother stated that Mr. Stack was not in attendance, stating "I had never met the man". Tr. at 1330. No regular education teacher appeared at all on the sign in sheet nor was such teacher in attendance, in violation of the regulation. Dist. Ex. D3-9.

28. At the March 13, 2013 CPSE Requested Review CPSE to CSE Transition meeting, Kevin Stark's name appears again as the chairperson and the signature appears different from that on August 6, 2012. Dist. Ex. D5-10. Instead, according to T.F.'s mother, no special education administrator including Director Chappell or Mr. Stack was present at the CPSE meeting, stating "[the sign in sheet] is definitely not an accurate document." Tr. at 1330. Director Chappell's name appears listed as the Chairperson who was expected to be at both August 6, 2012 meeting and March 13, 2013. Dist. Exs. D3-1, D5-1. No written consent was ever provided for, nor obtained by, T.F.'s parents for Director Chappell to miss either of these meetings. T.F.'s Parents did not consent to the general education teacher's absence at the August 6, 2012 meeting either. As such, the CPSE team was not properly comprised which negatively impacted T.F.'s education from the start and T.F.'s progress suffered as a result.

**RCSD Failed to Provide T.F. with Appropriate IEPs**

29. The District's failure to provide appropriate IEPs constitutes a clear denial of FAPE. Upon close review of the record, expert witness Harmon Cohen stated, "there are issues, in my opinion, of insufficient programming and inadequate IEP development." Tr. at 1151-52. T.F.'s IEPs were not reasonably calculated and failed to provide appropriate services, accommodations or goals to T.F.'s detriment.

30.     Furthermore, T.F.'s Parents did not receive the required prior written notices and procedural safeguard notices from the District to make complaints even though they were frequently refused the services they requested for their son following his IEP meetings. The District's serious procedural failures to follow the regulations deprived T.F.'s parents from substantively participating in the development their son's IEPs.

31.     RCSD has consistently failed to perform timely and adequate evaluations which has led to inaccurate information for the T.F.'s CPSE and CSE teams to rely on in the development of IEPs. Without adequate evaluations and data, T.F.'s IEPs cannot be reasonably calculated to provide any educational benefit. None of T.F.'s IEPs provided appropriate services or accommodations, nor did any of his IEPs contain sufficient goals.  The deficient IEP goals are not mitigated by the overly broad progress reports that fail to specify what progress T.F. is making. Dist. Ex. D67; D68.  Therefore, T.F.'s IEP goals could never be measurable because there is no starting baseline. The academic goals on all of T.F.'s IEPs are not properly tailored to his actual educational level. T.F.'s goals were not updated during numerous CSE meetings throughout each school year. T.F.'s extreme difficulties with reading, writing and mathematics were never addressed in his IEPs through academic goals. By the time T.F. did receive an increase in speech services, occupational therapy service, and counseling, these services did not improve or have any impact on his abilities, because the services and goals were not reasonably calculated.

32.     T.F. exhibited behavioral issues with severe school eversion that manifested into panic attacks with worsening tics and physical illness indicating that an FBA and BIP was required prior to the October 27, 2014 IEP.  However, no appropriate behavioral strategies were provided to T.F. and the absence of an FBA, BIP, or desensitization, which rendered the IEPs inadequate

and denied T.F. a FAPE. Where a student's behavior impedes his or her learning or that of others, the CSE must consider behavioral interventions, supports, and strategies to address that behavior. No desensitization or sensory diet goals were ever introduced in T.F.'s program. T.F. was never offered a one-to-one aide that may have allowed him to stay in a general education class rather than be placed in a self-contained class with students who are severely cognitively and behaviorally impaired. None of the services in T.F.'s IEPs ever addressed T.F.'s significant sensory integration deficits. Sensory needs should be appropriately addressed through occupational therapy with requisite equipment or other services for students, like T.F., who have sensory processing disorders. T.F. was not offered assistive technology even though he had severe difficulty with writing and often suffered from hand fatigue. No accommodations or aids were ever considered or provided. It was essential that T.F. receive services and accommodations that would allow him to derive educational benefit from the IEPs in a general education classroom. For all of these reasons, T.F.'s IEPs failed to contain reasonably calculated goals or appropriate services necessary to allow him to make meaningful progress in his educational program.

### T.F.'s August 6, 2012 IEP is Inappropriate

33.     T.F.'s August 6, 2012, IEP is inappropriate because it is based on inadequate evaluations from Just Kids which failed to provide him with appropriate services, accommodations, or goals. Again, the Just Kids Structured Observation dated July 10, 2012 is barely a paragraph long and does not state how long T.F. was observed for in minutes or hours. Dist. Ex. D21-1. Additionally, according to the Just Kids psychological evaluation dated July 10, 2012, it was determined that T.F. "does not presently meet criteria for special education services." Dist. Ex. D22-4. This was the determination made despite the result of psychological evaluation

commenting that, "[h]e had some difficulty duplicating simple block structures and designs. T.F. also had some difficulty copying simple line designs that were paired with geometric designs." Dist. Ex. D22-3. Furthermore, the Just Kids speech and language evaluation dated July 17, 2012 minimally qualified T.F. for special education services with speech therapy to be given as a related service. Dist. Ex. D23-6. This determination was made despite the Khan-Lewis Phonological Analysis-Second Edition (KLPA-2) finding that "T.F.'s overall intelligibility is poor. Quantitatively, when compared to his age and gender peers, his raw score converts to a standard score of 72 and reflects overall intelligibility at or better than 7% of males his age which is in the significantly below average range." Dist. Ex. D23-4. T.F.'s peers are already a year younger than T.F. due to RCSD delaying his start to his preschool education and yet his peers still outscore him for overall intelligibility.

34. Relying on these inconsistent July 2012 evaluations, the CPSE met on August 6, 2012 without Director Chappell present or any other special education administrator or regular education teacher. Dist. Ex. D3-1. It was determined in this CPSE Initial Eligibility Determination Meeting that T.F. would receive individual speech/language therapy twice weekly for 30 minutes as special education program and relates service. Id. The IEP start date for this service was 9/5/2012 and end date was 6/21/2013 with placement at the Just Kids Riverhead school in an approved special education program. Id. The inappropriateness of this IEP and inattention to T.F.'s needs is apparent where the Just Kids Annual Evaluation dated February 4, 2013 showed T.F.'s Developmental Assessment of Young Children- Second Edition (DAYC-2) score that "falls in the 16th percentile indicating abilities in the below average range of functioning." Dist. Ex. D24-3. The evaluation further raises concerns that T.F. is "distracted easily and requires prompts to stay on task… T.F. shows a lack of interest in academic-related

activities and he needs reminders to follow the classroom rules and routines. T.F. sometimes exhibits trouble transitioning into the classroom and separating from his parents in the morning…" Dist. Ex. D24-1. Despite these evaluations, T.F. was never offered any services beyond speech to assist him in achieving his academic and developmental needs.

### T.F.'s March 13, 2013 IEP is Inappropriate

35.     The March 13, 2013 IEP does not contain T.F.'s present level of academic achievement and functional performance. Therefore, T.F.'s IEP goals cannot be measurable since there is no baseline to draw from. This IEP does not consider the issue of T.F.'s 16th percentile in the below average range and barely considers the other concerns gathered from the DAYC-2. Dist. Ex. D4-1. This IEP fails to provide appropriate services because it reduces T.F.'s services from individual to small group (5:1) speech/language therapy without giving any explanation for the change in speech services from March 18, 2013 to June 21, 2013. Id. Despite the change in speech/language services, all of the goals in this March 14, 2013 IEP remained exactly the same as the August 6, 2012 IEP without any appropriate update. Compare Dist. Ex. D3-5 with D4-4, D4-5. This change in T.F.'s services was made again without Director Chappell present or any other special education administrator present as stated above. This change was also made despite the Annual Speech and Language Report dated January 31, 2013 which states that all IEP goals are continuing and have not yet been achieved. Dist. Ex. D25-1. According to this report,

> T.F. demonstrates a 23% of unintelligible utterances. This means that T.F. is understood 77% of the time by this examiner. He is understood by his teacher 73% of the time…. This indicates T.F.'s speech intelligibility count is below his age expected range as he should be much closer to 100% intelligible. While the use of many phonological processes impact T.F.'s speech intelligibility, his speech intelligibility also decreases when he becomes excited; as his rate of speech increases.

Dist. Ex. D25-5.

36.     Depriving T.F. of his individual speech/language therapy and replacing with group

therapy without explanation harmed T.F. in his progress and negatively impacted other

behavioral areas of his development.  This is apparent where the January 31, 2013 Annual

Speech and Language Report further states:

> While a decrease in avoidance behaviors has been noted ("I'm tired", "Are we done?",
> getting up from chair, changing and/or going off topic), T.F. has begun to use these
> behaviors again more recently…However, T.F. continues to demonstrate lingual
> protrusion during productions of /d/, /t/, 'ch', /s/ and /s/ blends during spontaneous speech.
> While T.F. is able to make eye-contact with clinician independently, he continues to
> require verbal reminders to maintain eye-contact necessary for articulatory precision of
> articulators."

Ex. D25-1. Despite this new information, no services or aids were suggested to help T.F. with his

educational or functional needs.

## T.F.'s September 24, 2013 IEP is Inappropriate

37.     Without an IEP already in place for the 2013-2014 School Year, T.F. began Kindergarten

ill-prepared. It was commented in the September 24, 2013 CPSE to CSE transition meeting that

"the classroom teacher indicated that in the large group setting it is difficult to understand T.F.

and he must be slowed down." Dist. Ex. D5-1.   In line with Dr. Cohen's expert testimony, a

"rollover meeting" took place on September 24, 2013 and the reasoning for this meeting is for

"Requested Review CPSE to CSE Transition".  Id. The IEP developed from this meeting was

therefore far delayed, since T.F. has already transition to Kindergarten.  The IEP also took no

consideration of the quarterly progress report done by Just Kids on June 12, 2013 stating that all

speech and language goals are continuing and that "avoidance behaviors continues to be noted

(imitating negative behaviors of peers, interrupting/talking during peers turns, making sounds

intermittently during session without warning, changing and/or going off-topic)." Pl. Ex. DD-1.

Only the March 2013 and older evaluations and reports were considered for this IEP. Def. Ex. D5-3.

38.     This IEP is deficient as it does not indicate whether T.F. was able to achieve the speech/language therapy annual goals from the 2012-2013 school year and does not contain T.F.'s present level of academic achievement and functional performance. Therefore, T.F.'s IEP goals cannot be measurable because there is no baseline to draw from. The IEP only states that his "articulation skills continue to be delayed at this time. His former SLP indicated he has improved over the year, but continues to demonstrate errors which impact his overall intelligibility. T.F. is aware of his weaknesses and it impacts him academically and socially." Dist. Ex. D5-5. Unlike T.F.'s initial IEP, this IEP is further inappropriate as there are no goals with short-term objectives outlining sub-skills or how observations will be recorded such as by using "checklists". Compare Dist. Ex. D5-6 with Dist. Ex. D3-5.

39.     T.F.'s lack of progress in his speech goals from the previous school year became apparent here as the IEP states that "he is reporting that students are teasing him about his speech." Dist. Ex. D5-2. Furthermore, his lack of progress was demonstrated in the quarterly progress report done by Just Kids on June 12, 2013, which stated that "T.F. continues to demonstrate lingual protrusion during productions of /d/, /t/, 'ch', /s/ and /s/ blends during spontaneous speech." Pl. Ex. DD-1. Despite being teased by peers and lack of progress, T.F. was still deprived of individual speech/language therapy sessions with the same service of small group (5:1) speech/language therapy from September 24, 2013 to June 20, 2014. Ex. D5-1. Again, no services beyond speech are considered for T.F. despite the behaviors he was demonstrating in the academic classroom. Those behaviors should have raised concern to the CSE that he was having other difficulties with his placement and services.

**T.F.'s April 21, 2014 IEP is Inappropriate**

40.     The April 21, 2014 IEP is inappropriate because it does not does not contain any "MEASURABLE ANNUAL GOALS".  Dist. Ex. D6-7.  As expert witness Dr. Cohen remarked "[i]t says, 'Replace this page with measurable annual goals.' I've never found any goals for that speech service." Tr. at 1169. No measurable annual goals are listed despite comments showing that "The speech teacher indicates that academic weaknesses are present.  He has difficulty tracking. When he gets lost he will need to restart… The /s/ and /th/ sound is a weakness" and he is not self-correcting unless prompted." Dist. Exs. D6-1, 6-2.  Notwithstanding these continued speech problems, T.F.'s services are lowered to one session weekly, instead of two, in small group (5:1) sessions.  Ex. D6-1.  Furthermore, there is no explanation offered for T.F.'s classification as "Other Health Impaired" or the need for psychological counseling services in individual and group sessions listed in the IEP. Id.

41.     At the annual review CSE meeting for the April 21, 2014 IEP, T.F.'s Parents raised a request for an occupational therapy evaluation for T.F.: "we had asked for an OT evaluation for [T.F.] because we felt that, you know, he really needed it, just watching how he wasn't able to write and all the other sensory and tactile things that he was having." Tr. at 1368. In acknowledging that T.F. has sensory "tactile issues," Kindergarten teacher Kelli Thompson stated:

>  ...I had noticed that he was wearing the same pants, and they said it was because of comfort… Another thing was when we were working with glue, [T.F.] immediately, before we were even done, would say 'I want to wash my hands.' ...He didn't like having the glue, the stickiness, on his hands.

Tr. at 918. These types of issues are common in children with autism spectrum disorder, yet the CSE failed to have T.F. evaluated for Autism. The CSE does nothing to consider the OT evaluation request or adding appropriate services or accommodations at this time despite the

obvious need for such an evaluation here. Nor does the CSE consider the functional behavior analysis remarks that "[s]ocially, he was reluctant to come to school." Dist. Ex. D6-1. The IEP is further inappropriate because it is developed at a CSE meeting stating "a consensus could not be reached" (Dist. Ex. D6-2) without providing more detail about what the disagreement was in the annual review meeting. Overall, this IEP is inappropriate because it lacks reasonably calculated academic, behavioral, and occupational therapy evaluations, services and goals.

### T.F.'s May 19, 2014 IEP is Inappropriate

42. The May 19, 2014 IEP is inappropriate because "MEASURABLE ANNUAL GOALS" were still missing from the IEP. This IEP lacks a statement of the T.F.'s "present levels of achievement" and functional performance in violation of 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa) and 8 NYCRR 200.4(d)(2)(i). Dist. Ex. D7-1. The CSE finally only recommended that T.F. have an Occupational Therapy (OT) evaluation in this IEP. Id. However, by this point the school year was coming to an end. This IEP only classifies T.F. as having a "Speech or Language Impairment". Id. There is nothing to show that this IEP was reasonably calculated to provide T.F. with educational benefit as evidenced by his continued failure to make sufficient progress in his program.

### T.F.'s June 18, 2014 IEP is Inappropriate

43. The June 18, 2014 IEP is inappropriate because still no "MEASURABLE ANNUAL GOALS" are included in the IEP again. Dist. Ex. D8-8. No goals including academic goals are included despite remarks that T.F. has difficulty with comprehension and "has great difficulty creating a simple sentence" and "needs to practice addition and subtraction problems". Dist. Ex. D8-5. The expert witness Dr. Cohen stated: "if you're documenting some academic challenges or delays, there certainly should be something in that IEP that addresses that, and that would be

part of whatever program he would be recommended for. But it would have to be an academic program, not just a related services program." Tr. at 1177.

44. Reading is also an academic challenge for T.F. despite the comments in this June 18, 2014 IEP stating that he is "currently reading at a level C, which is at the middle of kindergarten level." Dist. Ex. D8-1. T.F.'s mother claimed that this assessment that T.F. was reading at a level C is incorrect: "I think at that time it was an A." Tr. at 1426. T.F.'s actual lower reading level, which also shows lack of progress as well as substantial regression, became more evident when he is put on home instruction in First Grade and a Metro Therapy provider instructed him read a book "called 'We Make A Snowman'". T.F.'s mother stated that the instructor had T.F. read this book the entire time she worked with him: "So this was the only book that she was allowed to work on, and I thought it really strange … she told us why we were using the same one, that it's a level C, and [T.F.] can't read at a level C. By doing it over and over and over...he would have memorized [but] he's really on an A or a B." Tr. at 1508; Pl. Ex. V.

45. The CSE met to develop this IEP on June 18, 2014 for a "follow-up to Annual Review". Dist. Ex. D8-1. It was in this meeting that T.F.'s parents again reported that T.F. has been diagnosed with "Autism Spectrum Disorder, Anxiety Disorder and Tourette Disorder." Id. Furthermore, the comments state that "A report was reviewed by the pediatrician. He does have ADHD, and he does have sensory needs." Id. However, this IEP is deficient as there no discussion on how in this IEP on how T.F.'s disabilities affect T.F's involvement and progress in the general education curriculum.

46. No behavioral services for an FBA or BIP are considered or offered in this IEP even though T.F.'s parents express their concerns about T.F. in the comments: "He is beginning to act out. He is coming up with bottled up emotions. The parents are moving towards a self-

contained class. Parents report several incidents where his safety was at risk. T.F. is starting to live in his own world…He does not want to go to school." Id.

47.    The only change in services recommended in this IEP was to introduce T.F. with Occupational Therapy (OT) in Small Group (5:1) sessions twice weekly for 30 minutes. Id. However, this change to the IEP was made inappropriately as the June 18, 2014 meeting was tabled because "[w]e could not reach consensus". Dist. Ex. D8-2.  The comments should demonstrate what the lack of consensus reflected in this meeting and whether it dealt with OT services and frequency given that T.F.'s "[s]tandardized testing reveals scores in the lower average range.  Motor reduced visual perception falls at a 78.  Some concerns are focused on fatigue.  He has poor motor planning. His discrimination is weak." Id.  Furthermore, this IEP inappropriate because, despite recommending T.F. OT services, no goals for OT, including motor skills and sensory processing, are included.

## T.F.'s August 12, 2014 IEP is Inappropriate

48.    This August 14, 2014 IEP does not contain T.F.'s present level of academic achievement and functional performance and T.F.'s IEP goals cannot be measurable because there is no starting baseline. Annual Goals are finally included in the August 14, 2014 IEP for reading, speech / language, social / emotional / behavioral, as well as motor skills for T.F.'s progress. Dist. Exs. D9-7, D9-8.   However, the IEP nevertheless remains inappropriate as the CSE failed to develop goals calculated to ensure that T.F. would make educational progress for the 2014-2015 school year.  This IEP is deficient because the goal statements were overly broad.  The IEP goals do not identify the extent to which T.F. will demonstrate identified knowledge, behavior, and skills.  The IEP only measures quarterly if the goals have been achieved with criteria over 75% success over 10 months in every goal except for verb tense correction with 80% success

over 10 months. Dist. Exs. D9-7, D9-8. There are no short-term objectives concretely outlined targeting sub-skills, nothing is identified criteria for mastery, or procedures to be used for measuring progress and specified a date by which that progress was to be made in the short-term. The methods used to show how progress will be measured are only though "Recorded Observations" without detailing how often or for how long and under what circumstances those observations will take place nor who will record such observations. Id. Only the goal of using grammatically correct sentence patterns in conversational speech was included for the method of measuring the progress with "Classroom and Standardized Tests" without more detail as to what this means. Id.

49.     The reading goal on this IEP is inappropriate as T.F. was nowhere near a level C for mid-kindergarten and he needed a realistic goal given his actual ability at an Level A or Level B. T.F. was only "able to comprehend what is read to him orally. He has difficulty with letter names/sounds, decoding words, and comprehending what he reads." Dist. Ex. D11-6; Tr. at 1426, 1508. This inappropriate reading goal caused T.F. to fall far behind his classmates and caused him to miss obtaining passing marks for reading in Kindergarten. Appropriate OT goals are also not listed at all for sensory awareness and processing for sensory strategies to optimize T.F.'s learning potential after it had already been established that T.F. has sensory and tactile issues. Tr. at 918, 1368. Finally, no goals at all appear for writing or mathematics despite remarks that T.F. struggles with his skills in those areas. Dist. Ex. D9-5. The August 14, 2014 IEP is inappropriate because it only briefly states that T.F. "has a diagnosis of Asperger's", (Dist. Ex. D9-1), without including how T.F.'s disabilities affect T.F.'s involvement and progress in the general education curriculum. despite recognition that: "The classroom teacher indicates that he has difficulty separating from his parents…. He gets upset with changes in the environment…

He would act out aggressively and not real know why he did it. He needs consistency and structure. His fine motor skills are an area of concern. He does fatigue and needs additional time." Dist. Exs. D9-1, 9-2.

50.     T.F.'s general education Kindergarten teacher, Kelli Thompson, was not able to come to this CSE meeting despite her name appearing on this IEP. Here, T.F. was still in the regular education environment and his general education teacher was required to be at this meeting. Due to her absence, she offered a letter and sent a letter dated August 7, 2017. Dist. Ex. D39-1. However, this letter does not suffice to excuse her absence as RCSD failed to obtain a written letter from T.F.'s parents that they agreed that her attendance was not necessary. As T.F.'s mother testified, Mr. Renahan, the sub-CSE chairperson, and the CSE team "told us that [Kelli Thompson] was refusing to come, and I didn't want to have the meeting without having the teacher present because she had all of his work. You know, she was with him his whole kindergarten year, so we figured she needs to be there so that we could have this meeting." Tr. at 1441. Not only was T.F.'s general education teacher not present without parental agreement but Mr. Renahan took the place as chairperson of the CSE as Director Chappell was absent and there is no indication that the parents were in agreement to hold the CSE meeting without Director Chappell. Therefore, this IEP is inappropriate because it was developed with neither T.F.'s general education teacher present nor the special education administrator familiar with T.F.'s present needs.

51.     The IEP further inappropriately recommended that T.F. be placed in a Special Class: 15:1:1 five times weekly for 5 hours and 30 minutes. Dist. Ex. D9-1. The recommendation was inappropriate because T.F.'s parents were not able to get information on this class to give input as to whether taking T.F. out of general education would be appropriate in this 15:1:1 class size.

Tr. at 1443-444. T.F.'s mother stated "[w]e couldn't even get information about the class. We didn't even know if we were putting him in the right spot. I didn't know if there were kids with behaviors." Tr. at 1444. For this crucial decision, no school personnel were present as part of the CSE team that were familiar with this child's required educational needs and services. T.F.'s mother stated that she did not know anyone at the meeting: "there was Melissa Reyes, a special education teacher, we didn't know her. Alan Taylor, I never met him. Lisa D'Andrea, a speech pathologist, I never met her. The one person that should have been there that wasn't was his teacher from the following year [Kelli Thompson]". Tr. at 1443. The modifications in this IEP were inappropriate as there is also an increase of 4 times weekly for group Speech/Language Therapy to four times weekly but only for 20 minutes each. Dist. Ex. D9-1. The recommendations were made without the Speech Pathologist, Mary Iwanyckyj, being present. T.F.'s parents did not consent, in writing or otherwise, to this meeting without her being present. Dist. Ex. D9-16.

52. In this August 14, 2014 IEP it was also finally recognized that T.F. needed strategies for positive behavioral interventions, supports and other strategies to address behavior that impeded his learning and that of others. Dist. Ex. D9-7. However, no supports such as assistive technology devices are provided. It was determined that T.F. needed a behavioral intervention plan (BIP). Id. No FBA was addressed for this IEP either despite consistent requests made by T.F.'s Parents:

> [w]e had wanted [the BIP] since the following year. No, they were not going to do it for us. Renahan kept saying it would take too long, we don't have the staff to do it. I said, 'But other kids are getting it in Mrs. Fuhs's class.' Mrs. Fuhs [Johnston] kept giving us an attitude and she wasn't going to do this, 'I do things a certain way in my class and [T.F.'s] just going to have to deal with it,' and [T.F.] just couldn't do it.

Tr. at 1469-70. This was a necessary aspect for the IEP for T.F.'s Parents because "everything was basically shut down. No one was working with us at this point. Teachers were standing outside, getting their other children, and basically he had a full audience of all these teachers watching him, screaming, crying, yelling, vomiting… and I don't know why nobody was coming over and helping, but no one was coming to help [T.F.]." Tr. at 1457.

### T.F.'s October 14, 2014 IEP is Inappropriate

53. The October 14, 2014 IEP is inappropriate because the goals remain deficient as they are exactly the same as the overly broad goals in the previous August 14, 2014 IEP. Both IEPs completely leave out goals to address T.F.'s problems with mathematics, writing, and appropriate OT goals that deal with T.F.'s sensory problems. Ex. D10-6,7,8. In violation of 20 U.S.C. § 1414(d)(1)(B), this October 14, 2014 IEP does not contain T.F.'s present level of academic achievement and functional performance. Therefore, T.F.'s IEP goals cannot be measurable because there is no starting baseline.

54. The October 14, 2014 IEP, is further deficient as no evaluative data was discussed at the meeting to consider whether modifications to IEP goals or services were needed despite T.F.'s parents reporting the transition difficulties T.F. was experiencing to First Grade with his tics getting worse and walking into furniture. Dist. Ex. D10-1. Ultimately, T.F. was hospitalized on October 6, 2014 "to rule out a seizure disorder and to observe the increase in tic symptoms." Pl. Ex. M; Dist. Ex. D10-1. This demonstrated that T.F.'s disabilities, school aversion behavior and anxiety not only reduced his focus on substantive educational material but also rose to the level of panic attacks and physical illness. On October 8, 2014, Dr. Parampreet "personally evaluated and examined" T.F. and confirmed for his plan of care that he is a "6 year old male with Tourette's, Autism Spectrum Disorder, ADHD, Anxiety Disorder, Development Delays

presenting with worsening tics in limbs.  Over the past week it has worsened, over the past 2 days his whole body flinching, he is having difficulty walking, is unable to control how he is walking and has been walking into walls." Pl. Ex. M-6.

55.     The October 14, 2014 IEP is also inappropriate because it was falsified that T.F.'s Parent's "were in agreement with the recommendations", depriving T.F.'s Parents of a chance to meaningfully participate in the development of an appropriate IEP. Dist. Ex. 10-2.   T.F.'s parents did not agree with the CSE Team that recommended an ABAS as they wanted the CSE to follow Dr. Silverman suggestion for a Vineland assessment. Id.  In attempting to give input on this IEP T.F.'s mother states that at this meeting "we kept bringing up the FBA, the Vineland. We were like broken records, saying the same thing, can we please get a Vineland, can we please get an FBA, get the BIP; over and over. And it was always no, no, no." Tr. at 1444-445. T.F.'s Parents also did not agree with the CSE team that T.F. would  not be provided with an individual aide. Dist. Ex. D10-2.

56.     The behavioral consultant, Dr. Smith, reviewed the plan "developed for morning transition" as addressed in the October 14, 2014 IEP. Dist. Ex. 10-2.  The comments state that "this behavioral strategies plan for the morning is approved."  Id. However, this "behavioral strategies plan" was inadequate because the "social stories" were not effective for T.F. and the T.F.'s mother stated that she and T.F.'s father:

> went back to meeting after meeting... because Mrs. Fuhs said give [the social stories] more time, read the social stories, and we're showing the doctors the social stories and they're saying the same thing that we're saying; he's vomiting, removing his clothes, he's screaming and kicking, how can we read a social story, and it literally was me jumping in the back of the van going, okay, I'm trying to read this social story, he's vomiting all over the place and he's going "get off" and he's screaming… and I'm trying to read the social story ... And the doctors are saying it's making him more frustrated, he has Tourette's and he's getting more upset by the minute by these things.

Tr. at 474.

57.     This October 14, 2014 IEP is also inappropriately backdated for an FBA to occur over a

month before the IEP was even developed on September 3, 2014 for five times daily throughout

the school day across all environments to December 19, 2014. Dist. Ex. D10-9. T.F.'s mother

was very confused by this FBA recommendation and stated, "that's not what happened. That was

put in later. This wasn't made the day of the CSE, so I don't know when this was added in." Tr.

at 1471.

### T.F.'s October 27, 2014 IEP is Inappropriate

58.     The October 27, 2014 IEP is inappropriate because the goals continued to fail to be

reasonably calculated to provide T.F. an educational benefit as they are exactly the same as the

overly broad goals in the previous October 14, 2014 IEP and August 14, 2014 IEP. In violation

of 20 U.S.C. § 1414(d)(1)(B), this October 27, 2014 IEP does not contain T.F.'s present level of

academic achievement and functional performance.  Therefore, T.F.'s IEP goals cannot be

measurable because there is no starting baseline.  The October 27, 2014 IEP is further deficient

as it continues to completely leave out goals to address T.F.'s problems with mathematics,

writing, and appropriate OT goals that deal with T.F.'s sensory problems. Dist. Exs. D11-6,7,8.

59.     The October 27, 2014 IEP is inappropriate because it continues to not contain a BIP or

desensitization plan.  T.F.'s Parents requested a CSE meeting on October 27, 2014 given that

"T.F. was recently hospitalized due to a significant increase in tics…" Dist. Ex. D11-1.  His

parents also reported that "T.F.'s anxiety disorder manifests itself into serious avoidant

behaviors, which include aggression, vomiting, crying and attempting to remove his clothing."

Id.  T.F.'s Parents also reported that despite their best efforts, the behavioral intervention

specialist, Dr. Christopher Smith, would not provide them with information on T.F.'s

observations: "We couldn't get any information from Dr. Smith. I kept e-mailing him saying can

I please have any and all observations on [T.F.], and one minute [Dr. Smith said] [']I didn't observe [T.F.], the next minute it was I did observe him, but only for an hour...[']" Tr. at 1472. Only observing T.F. for one hour and observing him inconsistently makes Dr. Smith's reports inadequate for the formation of an appropriate FBA and formal BIP.

60.     T.F.'s parents expressed that "the current behavioral strategies that are designed to help T.F. are not appropriate." Dist. Ex. D11-2.  They insisted that T.F. have a "desensitization plan" since Dr. Silverman informed them that "kids with autism and Tourette's...could benefit from that and it makes a big difference… he had just gotten out of the hospital.. [we] went to the [CSE] team and said what if we do this… and they said no." Tr. at 1469.  At this point, only the FBA was being completed "in anticipation of a formalized BIP." Dist. Ex. D11-1.  T.F.'s parents also asked about extended services during the Summer but were denied: "We wanted extended school year because we felt like since he already couldn't write and he was having such difficulty, but they said he didn't qualify. It was the same thing as always. You know, I'm sorry, no, you can't have it, we're not going to do it." Tr. at 1445. No extended school year services are selected on this IEP. Dist. Ex. D11-1.

**T.F.'s December 2, 2014 IEP is Inappropriate**

61.     The December 2, 2014 IEP is inappropriate because the goals still failed to be reasonably calculated to provide T.F. an educational benefit.  The goals remained exactly the same as the overly broad goals in the previous October 27, 2014 IEP, October 14, 2014 IEP, and August 14, 2014 IEP.   The December 2, 2014 IEP also continued to completely leave out goals to address T.F.'s problems with mathematics, writing, and appropriate OT goals that deal with T.F.'s sensory problems. Ex. D12-6,7,8.  In violation of 20 U.S.C. § 1414(d)(1)(B), this December 2, 2014 IEP does not contain T.F.'s present level of academic achievement and functional

performance. Therefore, T.F.'s IEP goals cannot be measurable because there was no starting baseline.

62. The comments in the December 2, 2014 IEP state that "there were no changes to the IEP at this time. The meeting was abruptly adjourned by the advocate and parents. Although the parents and advocate wanted to discuss the FBA, T.F.'s lack of attendance thwarted completion of an FBA." Dist. Ex. D12-2. The comments within this IEP inaccurately and inappropriately describe the Parents as being obstinate here. Rather, T.F.'s parents and advocate were actively trying to work with the CSE team towards getting T.F. appropriate educational and developmental services. As T.F.'s mother states: "the advocate saw that they weren't following protocols and taking care of things on a legal end. She saw that they weren't working towards the FBA, they weren't being honest with the whole Dr. Preston situation. So at that point it was basically tabled, and they're writing down that it was abruptly halted." Tr. at 1516. "And Dr. Preston was contracted with the school, and we thought we were getting an independent evaluator and we were not." Tr. at 1512.

### T.F.'s June 25, 2015 IEP is Inappropriate

63. In violation of 20 U.S.C. § 1414(d)(1)(B), this June 25, 2015 IEP does not contain T.F.'s present level of academic achievement and functional performance. Therefore, T.F.'s IEP goals cannot be measurable because there is no starting baseline. Annual Goals are finally included in the August 14, 2014 IEP. The goals were previously left out on T.F.'s IEPs for mathematics and reading. Dist. Exs. D17- D19. Goals for reading, speech/language were slightly updated. Dist. Exs. D17-7, 8. However, the IEP nevertheless remains inappropriate as the CSE failed to develop goals calculated to ensure that T.F. would make educational progress for the 2015-2016 school year. This IEP is deficient because the goal statements were overly broad, and IEP as a whole

was unsatisfactory. The IEP goals do not identify the extent to which T.F. will demonstrate identified knowledge, behavior, and skills.

64.	The IEP goals for motor skills as well as social / emotional / behavioral goals inappropriately all remained the same as the previous overly broad IEPs since the August 14, 2014 IEP. Compare Dist. Ex. D17-9, 10 with Dist. Ex. D9-7, 8. T.F.'s parents further did not agree with Dr. Preston's recommendations from neuropsychological evaluation presented to the CSE, stating:

> He had no idea … about [T.F.]…a test is 8 to 12 hours and he [only] spent a half hour, every neuropsychological -- neuropsychologist I've talked to said that impossible, in a half hour you can't do a neuropsychological test…we asked him to get in touch with Dr. Manganas…He never once talked to Dr. Manganas… Now, here a neuropsychological doctor and you have a kid with Tourette's syndrome who was hospitalized only a few weeks prior, to not want to talk to that doctor or any doctor that the parents are giving you access to.

Tr. at 1523. Dr. Preston's recommendations and this IEP are not appropriate as the IEP remained void of a desensitization plan, support services, and appropriate occupational therapy services for T.F.'s sensory problems.

### T.F. Made No Meaningful Progress

65.	T.F. received inadequate services in Kindergarten and failed to pass all of his marks even though he was moved to First grade. T.F. only met 3 out of 5 of the "Fundation"[sic] level marks that a Kindergarten student is expected to meet. Furthermore, in Kindergarten, the CSE team states that T.F.'s reading level was on a level "C," when Kindergarten level students are expected to be at a D or an E reading level. T.F.'s reading level was even lower than level C as he was really a level A or a level B as T.F.'s mother testified to T.F.'s reading challenges. Tr. at 1426, 1508. T.F.'s actual lower reading level, which also shows lack of progress as well as substantial

regression, became more evident when, as T.F.'s mother describes, he was put on home instruction in First Grade and a Metro Therapy provider instructed him to read a book called:

> 'We Make A Snowman'. She had him use this book the whole time she worked with him. So this was the only book that she was allowed to work on, and I thought it really strange … she told us why we were using the same one, that it's a level C, and [T.F.] can't read at a level C. By doing it over and over and over...he would have memorized [but] he's really on an A or a B.

Tr. at 1508; Ex. V. It also becomes evident that mathematics and writing goals were needed on T.F.'s IEPs as he continued to suffer there academically as Dr. Preston's evaluations conveyed. Dist. Ex. D17-6.

66.     It is a denial of FAPE where a child is placed into a general education classroom and is not given enough services to make passing marks. T.F. was a special education student with an IEP who was placed in a general education classroom but was not given enough support services to make passing marks in the areas students at his level are expected to make. T.F. was denied a FAPE in his Kindergarten year. T.F. was denied FAPE in his First Grade Year because he was not placed in the least restrictive environment and because he did not actually receive the services or instruction he was supposed to receive pursuant to his IEP, a fact the District admits openly when they say through counsel that they are aware the District owes T.F. compensatory education for his Homebound Instruction year. Tr. at 111, 233.

**T.F. Suffered from Substantial Regression**

67.     T.F. suffered regression as the July 1, 2014 Psycho-Educational Evaluation by Uta Mochiak-Field states: "T.F.'s lower scores on the WIAT IIII could simply be an indicator of regression as related to having so many absences from school over the past year… T.F. definitely needs more instructional support within a school setting, and he needs it urgently." Dist. Ex. D19-9. Following this, on October 29, 2014, Dr. Silverman wrote a letter to RCSD stating that

T.F. "is functioning significantly below age level and recently has regressed in self-help skills".

Dist. Ex. D42-1. Furthermore, T.F. failed to make any progress with his reading goal on his

IEPs at the CSE team had his designated at a level C when he was actually on Level A or Level

B reading level and he was only "able to comprehend what is read to him orally. He has

difficulty with letter names/sounds, decoding words, and comprehending what he reads." Dist.

Ex. D11-6; Tr. at 1426, 1508. In fact, T.F.'s most recent IEP shows substantial regression stating

that T.F. "entered first grade reading at an independent TC level B, instructional level C." Dist.

Ex. D17-6. Appropriate OT goals are also not listed at all on IEPs for sensory awareness and

processing for sensory strategies to optimize T.F.'s learning potential after it has already been

established that T.F. has sensory and tactile issues so T.F. was not able to make progress with his

OT goals either.

68.     T.F.'s parents, through the State Complaint filed on November 10, 2014, allege that

> [d]ue to the fact that our son has not been receiving the Related Services listed in his IEP
> we are concerned that he will suffer from substantial regression. He is only receiving 1
> hour of instruction a day and we fear he will fall further behind academically. This is
> going to impact his self esteem and his view of school will suffer as well. We are also
> concerned that he is not being educated in the Least Restrictive Environment.

Pl. Ex. RR-2. T.F. suffered from substantial regression, not just a lack of progress, marking a

clear denial of a FAPE.

**RCSD Placement was Inappropriate Because It Failed to Fully Implement the IEPs**

69.     The RCSD board of education consistently failed T.F. in selecting the most reasonable

and appropriate special service program. None of the placements or proposed placements were

adequate to meet T.F.'s needs under either state or federal law and regulations. During T.F.'s

homebound instruction, the District failed in their responsibility under the law to find a

placement. During T.F.'s First Grade year, the District insists that T.F.'s placement in the 15:1:1

class was solely at the discretion of his parents. However, his parents were unable at any time to see a class profile for the proposed 15:1:1 placement. T.F.'s doctor recommended a 12:1:1 but the District said the class would be too low functioning:

> After she [Dr. Silverman] had recommended 12 or lower, and she said, 'What kind of classes do you have within the district?' He said he could not tell her that, and she said 'you must be able to tell me something about the class sizes that you have.' … And then [Mr. Renahan] said, 'Well, he wouldn't be able to go into anything 12 or under, it would be too low functioning.' And she said, 'Well, then you can make a class. So she did ask him if you could make something, and they said there was no way he could make something.'

Tr. at 1437.

70.    The IEP failed to be specific about the placement when the District offered a placement in a 15:1:1.  T.F.'s mother stated:  "We couldn't even get information about the class. We didn't even know if we were putting him in the right spot. I don't know if there were kids with behaviors. We didn't know – I had nothing. I did not know anything." Tr. at 1444. The District failed to provide information regarding the nature of the disability and functioning levels of the other children in the proposed class. The Parents also lacked information concerning pupil/teacher ratio, the degree of mainstreaming and related services, as well as information and assurances regarding the similarity of needs among the children in the proposed class.

71.    Following T.F.'s year of homebound instruction, his placement was left at "other public school" but no actual placement was ever made. The District failed in their responsibility to provide specific information for T.F.'s placement. Furthermore, none of T.F.'s placements included any of the other placement information required by the Education Department.

**RCSD Failed to Follow Legal Requirements for Self-Contained Class**

72.    T.F. was placed in a 15:1:1 class with children who had severe cognitive and behavioral disabilities. The children in T.F.'s class did not have needs that were similar to his own. RCSD

failed to place T.F. in a class with children who had average intelligence and a high capacity to learn. T.F.'s 15:1:1 teacher testified in this hearing that she did not believe that her class was the right placement for him.

## RCSD Failed to Educate T.F. in the Least Restrictive Environment

73.     The IDEA requires that students with disabilities be placed in the least restrictive environment (LRE) appropriate to their needs.  During his First Grade year, the District placed T.F. into a 15:1:1 class. T.F.'s teacher testified that the children in this class had severe cognitive and behavioral disabilities. "I have other children who are cognitively and behaviorally severely disabled…" Tr. at 1087. T.F. was not educated with any children who functioned on the same level as him. T.F.'s teacher further testified that he was a "role model" to the children in his class because he functioned at a level so much higher than them.  Tr. at 1099. The teacher stated that "honestly, that year, he was definitely my top – the top end of the class." Tr. at 1097. The District placed T.F. in this class without providing him with supplementary aids and services in a general education classroom, such as a one to one aide, a sensory diet ,or a desensitization plan. When asked whether the teacher ever considered that the 15:1:1 as not the right placement for T.F., his teacher testified: "Yes. Actually, the first time I met his parents, I said he's a very bright student – I mean very bright child." Tr. at 1105. The District also failed to consider a continuum of placement options for T.F. and instead placed him in a class with peers whose disabilities were extraordinarily greater than this and where he was never educated with nondisabled students. The 15:1:1 class was much more restrictive than necessary. However, T.F.'s Parents simply asked for him to have supplementary aids or services in a general education classroom or to have a smaller class size for him, such as is offered in a co-teaching model. His parents were never aware of the composure of the self-contained class, and were denied the ability to

determine if this was the best option for their son when the CSE declined to share information about the profile of the other students in the proposed setting. These facts amount to a clear violation of the least restrictive environment regulations.

### RCSD Failed to Adequately Supervise T.F. as a Result of Inappropriate Placement

74.     Several instances of improper supervision of T.F. are evident as he suffered from inappropriate placement in the general education classroom with un-serviced social/behavioral and occupational needs.  T.F. was not eating during lunch, cut his clothing in art class, and got lost in the school when unsupervised and without his own aide.  Tr. at 1376, 900-901; Pl. Ex. LL-10.  However, it became more evident no one was with T.F. at lunch and that T.F.'s placement was inappropriate as T.F.'s mother describes: "He had lost so much weight at that point. He was like -- every bone in his body was sticking out at that point. He was just very, very skinny. He wasn't eating anything, he wasn't drinking anything..." Tr. at 1372.

75.     The most glaring incident demonstrating inappropriate placement and inadequate supervision in the general education setting was when T.F. cut his clothing. T.F.'s First Grade Teacher testified on this incident that "[He] was at art, and when he came back and he sat down, I looked down and I saw his pants were cut up… Very jagged cuts down his pants." Tr. at 905. Referring to pictures of the clothing in Exhibit P, T.F.'s father testified, "...we found him wearing these jeans (indicating) and this shirt (indicating)... he was sitting in art class and was left alone.... If he's not watched 24/7... things like this will happen." Tr. at 1770; Pl. Ex. P. T.F.'s sister, also testified about this incident, "... because no one was watching him, he cut up his clothes. He went in the corner and cut up his clothes. I asked him why, and he said it was because he was nervous, so he cut up his shirt and it was also his pants." Tr. at 1892-93. T.F.'s parents contend that T.F. got hold of adult scissors to cut both his jeans and shirt. As to whether

adult scissors were in the art room, Principal Debra Rogers stated: "I would say yes. If I had to say right now do you think there's art scissors -- adult scissors, yes." Tr. at 2063.

76.     While in the general education class, Director Chappell testified "I became aware that there was a report that he had become lost at Phillips Avenue..." Tr. at 703. According to T.F.'s mother, "Mrs. Thompson had [T.F.] bring a letter… to the main office, and on going down to the main office, he got lost in the gym and didn't make it to the main office and ended up locked in the gym closet, somewhere in there, one of the locks that he couldn't get out." Tr. at 1407.

**RCSD's Proposed Placement of Homebound Instruction at School is Inappropriate**

77.     Failure to identify an appropriate, least restrictive program caused T.F. to medically, emotionally, and physically deteriorate to the point where his parents were forced to accept the only alternative left available to them which was homebound instruction, the most restrictive environment. Further, T.F.'s IEP should have been revised to reflect the change to homebound instruction within 11 days, as per the State Complaint, but it never was. Pl. Ex. RR.

78.     During homebound instruction, there were many weeks during T.F.'s received no instruction at all. The District has not presented evidence that there was ever at least 5 hours of instruction during one week of T.F.'s homebound instruction. The District never made up any of the missed instruction or related services that T.F. was required to receive while he was placed on homebound instruction. Not only did this failure to provide make up sessions cause T.F. to be denied a FAPE in the LRE, but also the District's failure is a blatant violation of the American with Disabilities Act and section 504 of the Rehabilitation Act.

**PROCEDURAL VIOLATIONS CONSTITUTE DENIAL OF FAPE**

79.     Beginning in preschool, T.F.'s parents did not receive either procedural safeguards notices or prior written notices at any time. The IDEA requires a school district to provide

parents with such notices once per year. The notice provides parents with information about presenting and resolving complaints, including the time period in which to make a complaint.

80.    T.F.'s mother testified that "we didn't get any of them [the notices]…not only did we not receive it…we had called the state, they did an audit of his file; they couldn't find it. Not only could they not find these prior written notices, they couldn't find progress notes, there was just nothing in his file upon calling the state." Tr. at 1305. The record in RCSD's own exhibits demonstrates that T.F.'s parents never received T.F.'s preschool notices because the Procedural Safeguards Notice is not included following the August 6, 2012 IEP and nothing, including the "Consent for Initial Special Education Services" dated September 13, 2012 is signed. Ex. D3-16. It is not until the October 14, 2014, IEP Requested Review 2014-15 that RCSD's witness Director Chappell incorrectly testified to giving T.F.'s parents and having them sign the Procedural Safeguards Notice. Tr. at 481 (referring to attachment after Dist. Ex. D11-16). In fact, nothing within the Procedural Safeguards Notice starting on Dist. Ex. D11-17 is signed by anyone or reviewed by the Parents.

81.    Without prior written notice T.F. suffered without the Parents having an opportunity to seek a change services, a procedural violation so significant to constitute a denial of FAPE. Here, most of T.F.'s parents' requests to change T.F.'s services were denied and they never received notice. As T.F.'s mother testified, "we were very new to special ed services, so we didn't know a lot of even what there was out there and no one was even telling us what we could get.... So it was a very difficult and sad time for [T.F.]." Tr. at 1308, 1309. Failure to provide these notices severely impacted T.F.'s academic progress because his parents were unaware they had any recourse to challenge the decisions of the CSE.

82.     Claims going back to T.F.'s preschool education are not barred by the two-year statute of limitations of the IDEA as the preponderance of the evidence shows that T.F.'s parents have presented a valid basis for tolling the statute. Pursuant to 20 U.S.C. § 1415(f)(3)(D)(ii), the statute must be tolled here because of the "withholding of information from the parent that was required under this subchapter to be provided to the parent."

**RCSD Denied T.F.'s Parents the Right to Effectively Participate in the IEP Process**

83.     In addition to never receiving prior written notices and procedural safeguard notices, T.F.'s Parents were denied the right to effectively participate in the IEP process. T.F.'s parents testified to not receiving T.F.'s IEP from preschool as well as other essential records including evaluations and progress reports. Tr. at 1305-06, 1535. T.F.'s parents were denied a statutory right to reasonable access of the records that deprived them of meaningful participation and negatively affected T.F.'s education. The preponderance of the evidence shows that the District failed to provide T.F.'s parents with IEPs as well as other documentation and the two-year statute of limitations is also justifiably tolled for this reason.

**RCSD VIOLATED SECTION 504 OF THE REHABILITATION ACT OF 1973**

84.     The parents have offered testimony that T.F. was discriminated against solely on the basis of his disability and have demonstrated bad faith and gross misjudgment on behalf of District. In violation of Section 504 of the Rehabilitation Act, T.F. was disciplined more severely than similarly situated non-disabled peers and because of his disabilities and associated behaviors as well as tics and noise making that manifested from his anxiety. T.F.'s mother described that he was yelled at by Mrs. Thompson when he was having a difficult time with his work due to his disabilities. Tr. at 1352 -5. T.F.'s mother describes when Mrs. Budd (Mrs. Thompson's classroom aide) would slam his hand on the table when T.F. could not do the work

because of his disabilities. Tr. at 1357.  It was also testified to that T.F. did not receive any type of award from his teacher when all of the other children in his class were awarded at the school assembly.  Tr. at 1365-66.

85.     Under Section 504, the regulations expressly require a new evaluation prior to any significant change in an individual's placement.  No evaluations took place before T.F. was placed in a self-contained classroom or on homebound instruction. Furthermore no evaluations occurred before T.F.'s placement was changed to "out of district placement." Additionally, under Section 504, schools must take reasonable steps to ensure that students with disabilities have access to the full range of programs and activities offered by the school. Reasonable steps can include provisions including reducing class size, use of on-on-one tutorials, classroom aides and note takers, involvement of a "services coordinator" to oversee implementation of special programs and services, and possible modification of nonacademic times such as lunchroom, recess and physical education. As Director Chappell testified "[t]here was never any mention of an assistive technology evaluation." Id. at 415. T.F. was never offered any type of assistive technology even though he had severe difficulty with writing and often suffered from hand fatigue.  No efforts were made to provide any of these services to T.F. so that he could succeed in his general education classroom in Kindergarten and none were considered so that he might avoid the self-contained classroom in First Grade. No evaluations were considered even when T.F. was placed on homebound instruction.

86.     Section 504 further requires that schools provide assistive technology devices to enable students with disabilities to fully participate in school activities as well as any training needed to effectively use the device. T.F. was not evaluated for any type of assistive technology, despite the fact that he was unable to write a simple sentence and had extremely poor writing fluency.

Assistive technology such as a keyboard could have expanded T.F.'s ability to perform on a similar academic level as his peers. Had T.F. been provided assistive technology in his classroom he may have never been placed in a 15:1:1 classroom, on homebound instruction, or placed out of district. T.F. suffered without assistive technology to help T.F. with his autism, ADHD, and suspected dyslexia reading disorder.

## RETALIATION FROM THE DISTRICT

87.     T.F.'s family testified and submitted evidence that RCSD did intimidate, threaten and interfere with T.F. and his family for advocating for his rights in violation of the ADA. After volunteering for the better part of T.F.'s kindergarten year, T.F.'s Parents were excluded from Mrs. Thompson's class and school activities in June of 2014 due to their advocacy on behalf of their son.  As their daughter testified, "all of the sudden, once they started advocating for T.F., no one wanted them to be a part of the PTO." Tr. at 885. As a result, T.F. suffered without the support of his parents within the school.  Furthermore, T.F.'s mother stated that T.F. was disparaged for his Native American heritage:

> Mrs. Fuhs's class was not at all receptive to anything other than certain types of people, so that became a problem…He was told to cut his hair, he was made to feel like less than the little kids that had certain nationalities and were treated very well. [T.F] was treated very poorly. Just the fact here of how he was treated, and Dr. Silverman saying many times we can't even get basic, basic care for this little boy.

Tr. at 1532.

88.     T.F.'s parents as well as their oldest daughter suffered retaliation for advocating on behalf of T.F. as the school called Child Protective Services (CPS) and filed false report of medical neglect and educational neglect. Pl. Exs. UU, TT; Tr. at 1795-96, 1539-40. The CPS case was ultimately found to be unfounded against any member of T.F.'s household. Tr. at 1545. The CPS attack against the family was extremely coercive, threatening, harassing, and

intimidating to T.F.'s family. The CPS case was lodged only days after the Parents' original attorney put the District on notice to expect a due process complaint. As T.F.'s sister testified "it was just out of retaliation from the Riverhead Central School District. Me, as well as my mother and my father, were always there to help T.F. with his education…So it was pretty appalling when we got these letters." Tr. at 1896.

89.     It was also testified to that T.F.'s Parent's youngest daughter suffered retaliation from the District while enrolled in the District upon her eighth-grade graduation ceremony: "they told her, you know, we're sorry but you cannot walk across the stage for graduation. They did not give us a reason. The next day we called the guidance department in the Riverhead Middle School and they said, well she could have walked, so I don't know why they told you she couldn't have…" Tr. at 1899, 1900.

**Proceedings Before the Impartial Hearing Officer**

90.     On May 27, 2015, the Parents filed a due process complaint alleging that the District failed to offer T.F. a FAPE since 2012. See, Dist. Ex. 1.

91.     The impartial hearing in this matter convened on August 28, 2015 and concluded on March 21, 2017 over 12 days of proceedings. Tr. at 1-2104.

92.     The IHO rendered a one half-page decision on July 28, 2017 devoid of any legal authority, explanation, or specific reference to the hearing record.   See, IHO Decision.

93.     The IHO's decision favored the District stating that it met its obligation to provide a FAPE to T.F.  Plaintiffs appealed this decision to the SRO and raised several allegations with respect to the IHO's improper conduct.  SRO Decision, at 12-13.

94.    The IHO's decision also granted the T.F. and his parents compensatory speech and occupational services for one school year. The District cross-appealed this portion of the decision to the SRO.

## STATE REVIEW OFFICER'S DECISION

### IHO Conduct

95.    On November 27, 2017, the SRO issued Decision No. 17-075 on this matter.

96.    The SRO correctly found that the IHO in this matter failed to adhere to any standard legal practice.

97.    The SRO correctly found that the IHO "simply ignored the issues raised by parents in their due process complaint notice." SRO Decision, at 13.

98.    The SRO correctly found that the IHO's decision does not comply with the requirements set forth in State regulation.

99.    The SRO correctly found that "Although the hearing record contains over 2000 pages of hearing transcript, developed over 12 days of proceedings conducted over a period of almost a year and half, and over 120 exhibits, the IHO issues a one half-page decision devoid of any specific reference to the hearing record or to any legal authority." Id.

100.    The SRO correctly found that the IHO provided no explanation for how the IHO reached his conclusion that the District offered the student a FAPE.

101.    The SRO correctly found that the IHO's FAPE determination in favor of the District also contradicts the IHO's award of compensatory services for the student.

102.    The SRO correctly found that the IHO failed to include an exhibit list.

103.    The SRO correctly found that the IHO failed to provide the required statement advising the parents of their right to obtain review of his decision by an SRO.

104.     The SRO correctly found that the IHO was in violation of State regulation requiring the decision to be rendered and mailed no later than 14 days from the record close date.

105.     However, in response to the Parent's complaint that the IHO failed to provide them with a copy of his decision at all, the SRO was correct to remind the IHO that "an impartial hearing officer shall 'render a decision, and mail a copy of the written, or at the option of the parents, electronic findings of fact and the decision to the parents.'" SRO Decision, at 13.

106.     The SRO is mistaken in suggesting that the IHO's failures did not cause any harm to T.F. and that the Parents did not allege that the failures caused harm to the student. The Parents raised such issues for no other reason then that the IHO harmed their son. By allowing a proceeding to go on for a year and half, and to leave T.F. with a decision that lacked any reasoning, reference to the proceeding, or adherence to legal standards is inherently damaging to the student and his pursuit of educational justice in enforcing his rights to a FAPE as a disabled student. Not only has the District grossly failed this student but so has the IHO in this case.

**Scope of Review**

107.     The SRO suggests that the Parents did not raise a number of issues on appeal that were previously asserted in the Parent's Due Process Complaint notice. However, the SRO also says that the IHO "simply ignored the issues raised by the parents in their due process complaint." SRO Decision, at 13. Due to the 10 page space limitation imposed by the regulations to appeal the IHO's decision, the Parents simply were no able to specifically outline each issue originally raised and instead focused on the most important issues. However the parents alleged, and the SRO found, that none of the issues originally raised were decided upon. This breakdown of the administrative process warrants a preventative measure against the abandonment of the Parent's claims on administrative appeal.

108. Because none of the original issues in the Due Process Complaint were decided on, these issues should have survived the SRO's review of the IHO decision, notwithstanding the 10 page limit in raising issues for appeal and in light of the Parent's arguments that the IHO did not render a decision on any of the issues the Parents raised in their 54 page due process complaint.

109. The SRO erred in deeming that the Parent's claims were abandoned and did not have to be addressed.

110. The SRO mischaracterizes that the Plaintiffs alleged for the first time on appeal to the SRO that T.F. did not have an IEP in place at the start of the 2013-2014 school year. See, SRO Decision at 14. Plaintiffs alleged this claim during the impartial hearing and within the Plaintiffs' Closing Brief to the IHO. T.F. was without an IEP already in place for the 2013-2014 School Year when he began Kindergarten. Plaintiff's expert witness, Dr. Cohen, testified that a "rollover meeting" took place on September 24, 2013 and the reasoning for this meeting is for "Requested Review CPSE to CSE Transition". Dist. Ex. D5-1. The IEP developed from this meeting was therefore far delayed, since T.F. already transitioned to Kindergarten. The September 24, 2013 IEP also took no consideration of the quarterly progress report done by Just Kids on June 12, 2013 stating that all speech and language goals are continuing and that "avoidance behaviors continues to be noted (imitating negative behaviors of peers, interrupting/talking during peers turns, making sounds intermittently during session without warning, changing and/or going off-topic)." Pl. Ex. DD-1.

111. The SRO failed to consider Plaintiffs' alleged violations of Section 504 regarding retaliation and discrimination by the District and its personnel because these issues were out of her jurisdiction. We raise those issues here properly before this court.

**Statute of Limitations**

112.    The SRO properly found that "the hearing record supports a finding that the withholding of information exception to the IDEA's limitations period applies in this instance and the parent's claims regarding the 2012-2013 school year are not time-barred by the two-year limitations period for requesting a hearing." SRO Decision at 17.

**Procedural Violations**

113.    The SRO in this case found at least 8 procedural violations during the due process complaint period. Some of those procedural violations continued uncorrected for three school years and throughout numerous IEPs.

114.    The SRO explained that the Second Circuit has held that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." <u>R.E. v. N.Y.C. Dep't of Educ.</u>, 694 F.3d 167, 190 (2d Cir. 2012); SRO Decision at 11.

115.    The SRO continuously pointed out that the procedural violations that she found did not individually constitute a denial of FAPE.  The SRO failed, as a matter of law, to consider how the procedural violations cumulatively resulted in the denial of FAPE for this student over the entire period covered by the due process complaint, which was equivalent to both the entire time the student was enrolled as a student in Riverhead Central School District and spanned the child's entire educational career.

116.    Additionally, the SRO failed as a matter of fact, to recognize the Parent's showing in their 54 page long Due Process Complaint of how the procedural violations "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decision

making process," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415

(f)(3)(E)(ii); <u>A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.</u>, 553 F.3d 165 at 172.

117.    In determining that the Parent's claims are not time-barred by the statute of limitations,

the SRO undertook a lengthy analysis of whether the District withheld mandatory procedural

safeguard notices and prior written notices to the parents. Ultimately the SRO found that the

District finally provided such notice to the Parents "shortly prior to their commencement of the

present proceeding." SRO Decision at 17.

118.    The SRO, however, provided no analysis of whether the District committed procedural

violations by not providing the parents with procedural safeguard notices for the first three years

of the T.F.'s enrollment in special education in the District.

119.    The SRO provided no analysis of whether the District committed procedural violations

by not providing the Parents with prior written notices for the first three years of the child's

enrollment in special education in the District.

120.    However, such procedural violations for the failure to send prior written notices and

procedural safeguard notices must be founded if the SRO found that they were never sent for the

purposes of determining that the Parents' claims are not time-barred by the statute of limitations.

121.    The SRO erred by not considering that failure to provide procedural safeguard notices as

mandated is a serious procedural violation. This violation is perhaps the most serious under the

law, since the Parents have no recourse to bring a due process complaint for procedural

violations without being aware of their rights. In effect, this failure "impeded the child's right to

a [FAPE] and significantly impeded the parents' opportunity to participate in the decision

making process."  20 U.S.C. § 1415(f)(3)(E)(ii); <u>A.C.,</u> 553 F.3d at 172.  "Under the IDEA and

federal and State regulations, a district must provide parents with a copy of a procedural

safeguards notice annually (20 U.S.C. § 1415[d][l][A]; 34 CFR 300.504[a]; 8 NYCRR 200.5[f][3]). SRO decision at 15.

122.    The serious procedural violation of not proving procedural safeguard notices spanned the first three years of T.F.'s education and any other procedural violations must be considered cumulatively with these violations.

123.    The SRO should have determined that failure to provide prior written notices for the first three years should also be considered a "serious procedural violation" as it similarly "impeded the child's right to a [FAPE] and significantly impeded the parents' opportunity to participate in the decision making process."  20 U.S.C. § 1415(f)(3)(E)(ii); A.C., 553 F.3d at 172.

124.    The failure to provide prior written notices over the three years must also be considered cumulatively with all of the other procedural violations committed against T.F.and the Parents during the applicable time periods.

125.    The SRO failed to determine that the District's failure to evaluate T.F. for reading disorders, ADHD, Tourette disorder, sensory impairments, motor function weakness and other needs requiring OT services constituted a procedural violation. The Parents argued similarly in their Due Process Complaint that these failures occurred in each year that the student was enrolled in the District.

126.    Failure to evaluate the child for these disorders "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); A.C., 553 F.3d at 172. Because the District had no baseline data on these issues, they could not have provided T.F. with any service for them. Additionally, the Parents had no recourse to challenge the District's failure to evaluate since they were not provided any type of procedural safeguard notices or prior written notices to let them

know the basis of what the CPSE and CSE would be considering in developing T.F.'s IEP. The cumulative effect of these procedural violations resulted in a FAPE to this student.

127.    However, the SRO should have considered the numerous other procedural violations as having a cumulative effect of denial of FAPE for this young child. Those will be discussed individually by the IEPs in the following section.

### 2012-13 School Year Procedural Violations

128.    The SRO correctly determined that the District failed to provide the Parents with a list of evaluators as required "[u]nder the New York State Education Law, once a student is referred to the CPSE, the district must provide the parents with a list of approved evaluators in the geographic area from which the parents may select to evaluate the student (Educ. Law § 441 0[4] [b ])".  SRO Decision at 18.

129.    The SRO erred in determining that the failure to provide a list of evaluators was not a procedural violation resulting in the denial of FAPE. When looked at cumulatively with the violations discussed above, and considering the Parent's allegation in their Due Process Complaint that they could have picked a full day program instead of a 2 hour per day program. All considerations together require that there must be a finding of FAPE for this school year.

130.    The SRO correctly determined that the District failed to properly compose the CSE team for the August 2012 IEP meeting by failing to provide a regular education teacher as required by U.S.C. § 1414[d][l][B][ii]; 34 CFR 300.32l[a][2]; 8 NYCRR 200.3[a][2][ii]). The SRO was correct in determining that the failure was a procedural violation.

131.    The SRO erred in determining that this procedural violation denied the student a FAPE. Considered with the other many procedural violations committed by the District for this school year, a denial of FAPE must be found. The Parents clearly allege in their Due Process Complaint

that T.F. had an extremely hard time transitioning to the program, and was observed to scream and cry on a daily basis. Because of the absence of the general education teacher at the meeting, the Parents were unable to discuss the educational setting with the teacher, and plan for strategies to help the student cope in the classroom. The teacher's absence, cumulative with all of the other procedural violations significantly "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decision making process," and "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); <u>A.C.</u>, 553 F.3d at 172. At the end of this 2012-2013 school year, the teacher notes that "he can't identify the larger of two numbers or match number of items in a set to the correct numeral. T.F. did not respond to questions relating to time, the four seasons, left and right, or units of currency. He could not identify complete sentences, and could not tell the difference between similarities or differences." Dist. Ex. D1-6. The DAYC-2 notes that "T.F. can't follow three-step directions that are not related, is task-avoidant and doesn't follow routines." <u>Id</u>. In regards to social skills, T.F. "could not tell a 'simple joke', has difficulty taking turns, engaging peers and expressing anger with 'nonaggressive words'. <u>Id</u>. T.F.'s teacher further noted that T.F. "plays alone instead of with others; [t]he only toys he was noted to play with were Legos.'" <u>Id</u>. at 6. T.F. was deprived an educational benefit as none of these areas were addressed in his general education classroom and no supports were given to him in general education to meet these basic milestones.

132.     The SRO erred in failing to find that the CSE's decision to place T.F. in a general education classroom with no general supports for the 2013-2014 school year constituted FAPE. It must be viewed in the light that the Parents still had no procedural safeguard notices and no prior written notices from the District during this time period. T.F.'s Parents were not able to meaningfully have input on the CSE team, and T.F.'s education suffered greatly as a result.

133.    Despite T.F.'s shortcomings in his special education preschool program, he was

recommended to attend a general education kindergarten classroom with no classroom supports

for the 2013-2014 school year. The Parents had still not received any procedural safeguard

notices and had no way to know to assert their rights in obtaining an appropriate education for

their child. They also had no prior written notices so they had no way to have any input into the

decision that were being made for their child before the CSE meetings, effectively denying them

the ability to participate in the proceedings or to know their right to challenge the decisions of

the CSE.

134.    T.F.'s Parents were concerned that the behaviors T.F. was displaying as a result of his

autism, Tourette's and ADHD disorders were impeding his ability to make progress in the

classroom. Additionally, they were worried about his many absences due to his school avoidance

behaviors, which included crying, screaming, throwing up, ripping and cutting off his clothes,

and refusing to get into the car or out of the car to go to school. Despite bringing up these

concerns, the CSE did not conduct an appropriate FBA or BIP. This is despite the fact that" the

student had 18 absences the first trimester of the 2013-14 school year, and his transition into the

classroom upon his return to school after an absence was more difficult for him." SRO decision

at 28. These absences caused by T.F.'s school avoidance behavior had a clear effect on T.F.'s

education during this school year.

135.    The SRO erred in not finding that the failure to conduct an FBA or BIP resulted in a

denial of FAPE to the student for this 2013-14 school year. The CSE met numerous times this

year due to the extreme difficulty T.F. was having and still offered him no supports,

behaviorally, socially or academically.

136.     The SRO erred in not looking beyond T.F.'s IEP to his true lack of functioning in his general education classroom and failure to make the progress that a kindergartener is required to make upon completion of the year to move to First Grade, as discussed above, to find a denial of FAPE for this school year.

## 2014-15 School Year Procedural Violations

137.     The SRO was correct in finding that procedural violations in the 2014-2015 school year amounted to a denial of FAPE for the student.

138.     The SRO, however, failed to consider the cumulative effect of the past two years of procedural violations resulting in FAPE denial on the continuing violations which occurred in this school year.

139.     The SRO correctly found that the District failed to properly compose CSE 2014-15 in the August 2014 meeting where no general education teacher was present.

140.     The SRO correctly determined that the failure to complete an FBA as promised for the October 2014 IEP was a "serious procedural violation." SRO Decision at 39.

141.     However, the SRO erred in not recognizing that the failure to complete an FBA, as a serious procedural violation, did contribute to a denial of T.F.'s FAPE.

142.     The SRO correctly found that the District failed to make reasonable efforts to consider accommodations for the student in a general placement classroom and to provide for the use of supplemental aids and services at the August 2014 IEP meeting.

143.     The SRO correctly found that the District did not consider any other placement options for T.F. and that the failure to recommend an appropriate placement in the LRE was a denial of FAPE for the 2014-2015 school year.

144.    However, the SRO incorrectly found that placement and tuition at a nonpublic school was not requested during the impartial hearing. It was expressed in a written closing statement to the IHO that T.F. will need to attend an autism focused education program to get the maximum educational benefit. Because T.F. missed out on his early education at RCSD, he has more barriers than other children towards catching up in his basic reading, writing, and math skills in an appropriate placement. T.F. will most likely need to attend and educational program until he turns age 21.  An option that the Parents have raised with the IHO in closing statements and in the Due Process Complaint is Gersh Academy (Dist. Ex. D1-38) for appropriate placement or other nonpublic school specializing in servicing students with autism in Suffolk County, New York. T.F.'s attendance in an autism centric program should extend the maximum amount of time he is eligible to attend. T.F. needs to be in a program that can provide other high functioning autistic peers as well as sensory diets and a personal one-on-one learning aide.

145.    Based on all of the above, the SRO should have found a pattern of serious procedural violations which cumulatively resulted in a denial of FAPE for the entirety of T.F.'s educational career at the District.

### FIRST CLAIM FOR RELIEF

### Denial of FAPE in Violation of the IDEA

146.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

147.    Based on the foregoing, Plaintiff's rights, and those of their disabled child, were violated under the IDEA, the federal regulations promulgated thereunder, Article 89 of the New York State Education Law, and the regulations of the Commissioner of Education, Part 200.

148.    Defendant failed to develop or provide a FAPE in accordance with the procedural safeguards and pursuant to a proper IEP for Plaintiff's child as required by law for the 2012-13, 2013-14, and 2014-15 school years.  Defendant failed to ensure that procedural requirements guaranteeing parental participation and due process were used or provided and failed to reasonably calculate a plan that was likely to address the student's educational needs and deficits.

149.    Procedural and substantive violation of the IDEA led to a denial of FAPE for the 2012-13, 2013-14, and 2014-15 school years.

150.    Plaintiffs are entitled to all appropriate relief avail under provisions of the IDEA, including specific remedy of placement at the Gersh Academy with coverage of any tuition and necessary fees, all actionable under the IDEA, 20 U.S.C. Sections 1401, et.al., 34 C.F.R. Section 300.

## SECOND CLAIM OF RELIEF

### Violation of Section 504 of the Rehabilitation Act

151.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

152.    Based on the foregoing, Plaintiffs rights and the rights of T.F., as a qualified individual with a disability, have been violated under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and its implementing regulations.

153.    Section 504 provides, in pertinent part, that "[n]o otherwise qualified individual with a disability … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

154. Based on the foregoing, the Defendant unlawfully discriminated against T.F. by excluding him from his right to receive a FAPE for the 2012-2013, 2013-2014, and 2014-2015 school years in violation of Section 504.

155. Based on the foregoing, Defendant further unlawfully retaliated against T.F and his family in violation of the Section 504.

156. The Defendant did not accommodate T.F.'s disabilities by failing to evaluate and develop an appropriate IEPs that addressed T.F.'s disabilities. This was due in part to the serious procedural errors the Defendant failing to provide the Parents with prior written notices, procedural safeguards notices, and other information regarding T.F.'s progress, to have the Parents be equal members of the CSE team. Defendant also failed to follow the numerous recommendations of T.F.'s doctors most familiar with T.F.'s disabilities.

157. Such conduct amounts to reckless disregard and gross deliberate indifference to T.F. because of his disability in violation of Section 504.

158. Defendant violated federal regulation 34 C.R.F. § 104.35 by failing to evaluate and appropriately place T.F., who because of his disability, needed special education and related services.

159. Plaintiffs are entitled to recover from the Defendant reasonable attorneys' fees, appropriate compensatory education and monetary relief for these violations, all actionable under the Civil Rights Act, 42 U.S.C. § 1983.

### THIRD CLAIM FOR RELIEF

### Violation of Rights Under the Americans with Disability Act

160. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

161. Based on the foregoing, Plaintiffs rights have been violated under Titles II and II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12191, 12182(a) (1998) (the "ADA").

162. Based on the foregoing, the Defendant unlawfully discriminated against by excluding him from his right to receive a FAPE for the 2012-2013, 2013-2014, and 2014-2015 school years in violation of Title II of the ADA.

163. Based on the forgoing, the Defendant further unlawfully retaliated against T.F. and his family in violation of Title II of the ADA.

164. The Defendant's refusal to follow the recommendations of T.F.'s doctors regarding T.F.'s emotional distress and medical condition for which he was hospitalized, the negative discriminatory and retaliatory treatment, the failure to make reasonable accommodations, and the denial of related services and appropriate behavioral supports, entitles Plaintiffs to declaratory and injunctive relief, as well as compensatory and punitive damages, all actionable under the ADA and the Civil Rights Act, 42 U.S.C. § 1983.

## FOURTH CLAIM FOR RELIEF

### Denial of Rights Under New York State Law

165. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

166. Defendant has violated the rights of the Plaintiffs under New York Education Law §§ 4401, 4402, 4404 and 4410 and Part 200 of the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. § 200.

167. By failing to provide T.F. with FAPE, the District has violated the rights of T.F. and his parents under New York Education Law § 4402.

168.    Based on the foregoing, the Defendant unlawfully discriminated against T.F. by excluding him from his right to receive a FAPE for the 2012-2013, 2013-2014, and 2014-2015 school years in violation of the Dignity for All Students Act, L.2010, ch. 482, § 2, New York Education Law § 10 et seq.

169.    Based on the foregoing, Defendant unlawfully retaliated against T.F and his family in violation of the Dignity for All Students Act, L.2010, ch. 482, § 2, New York Education Law § 10 et seq.

## RELIEF SOUGHT

WHEREFORE, it is respectfully requested that the Court:

(a)    assume jurisdiction over this action;

(b)    declare Plaintiffs to be the "substantially prevailing party" as the SRO properly determined that the District failed to provide T.F. a FAPE for the 2014-2015 school years;

(c)    reverse in part the November 27, 2017 decision of the SRO insofar as it found that the District offered T.F. a FAPE for the 2012-2013 and 2013-2014 school years;

(d)    issue a judgment finding that Defendant unlawfully discriminated against T.F. by excluding him from his right to receive a FAPE for the 2012-2013, 2013-2014, and 2014-2015 school years in violation of Section 504; Title II of the ADA, and the Dignity for All Students Act, L.2010, ch. 482, § 2, New York Education Law § 10 et seq.;

(e)    issue a judgment finding that Defendant unlawfully retaliated against T.F and his family in violation of Section 504; Title II of the ADA, and the Dignity for All Students Act, L.2010, ch. 482, § 2, New York Education Law § 10 et seq.;

(f)     award Plaintiffs placement and tuition for T.F. to a nonpublic school that specializes in autism in Suffolk County, such as Gersh Academy, until he reaches the age of 21 as requested in the closing statements to the IHO and the Parent's written Position on Appropriate Compensatory Remedy submitted at the direction of the SRO;

(g)     award Plaintiffs compensatory education in this case as the District's attorney has already admitted the District's fault and noted that the District "is well aware that it owes this child compensatory education…" Tr. at 223. The appropriate compensatory education award for T.F. includes but is not limited to: Independent Reading Disorder Evaluation by provider of Parent's Choice; Independent Neuropsychological Evaluation by provider of Parent's Choice; Occupational Therapy for 3 years based on level indicated on 2014-15 IEP; Counseling for 3 years based on level indicated in the 2014-15 IEP; Full time classroom, specials and transportation one-to-one aide for 3 years based on level indicated on 2014-15 IEP; Speech Language Therapy for 3 years based on level indicated on 2014-15 IEP; Individual Tutoring Services for 3 years current to what T.F. is learning in his school program; Assistive Technology Devices such as an iPad including autism based learning software; and Laptop or Desktop Computer for homework and typing assignments at home;

(h)     award Plaintiffs reasonable attorney's fees and other recoverable costs at the administrative level before the IHO, at the SRO level, and in the present action, pursuant to 20 U.S.C. § 1415 of the IDEA and 42 U.S.C. Section 1988 of the Civil Rights Attorneys' Fees Awards Act; and

(i)     award Plaintiffs their costs and any further relief, including injunctive relief, as may be appropriate.

Respectfully submitted by,

DATED: March 26, 2018

_____
Tela L. Troge, Esq.

_____
Kelly Dennis, Esq.

Attorneys for Plaintiffs-Appellants

Law Offices of Tela L. Troge, PLLC
50 Hill Street, Suite 124
Southampton NY, 11968
Ph: (631) 745-6203
Fx: (631) 614-4113